270

24 C.C.P.A.(Patents)

## MORGENSTERN et al. v. BURTON.
### Patent Appeals No. 3810.

Court of Customs and Patent Appeals.
June 7, 1937.

and a patent issued to appellants on November 28, 1933, upon an application filed October 5, 1931. Appellee, being the first to file, is the senior party. Appellants derive no advantage over appellee by reason of the issue of their patent, as appellee's application was copending at the time of the issue of said patent.

But one count is involved, which was copied by appellee from appellants' patent. The count reads as follows:

"1. A system for converting a non-continuous wave made up of peaked current impulses into a square-top continuous wave, comprising a pair of thyratron tubes and matched input and output circuits therefor, said input circuits comprising means for applying peaked non-continuous current impulses to said thyratron tubes as starting voltages therefor, said output circuits comprising means for causing the starting of either tube to stop the other tube, whereby the peaked impulses cause the production in the combined output circuit of the thyratron tubes of contiguous square-top impulses to produce a wave continuous in character."

The invention relates to the art of telegraphy, wherein peaked waves as received are converted into square-topped waves. Within the motion period following the declaration of the interference, appellants moved to dissolve the interference upon the ground that appellee had no right to make the claim corresponding to the count, the reason given being that appellee's application, as originally filed, did not disclose the invention, and that amendments subsequently filed constituted new matter.

The motion was denied by the Primary Examiner, and thereafter the Examiner of Interferences entered judgment upon the record against appellants, awarding priority of invention to appellee, following an order to show cause issued by him.

Upon appeal to the Board of Appeals, it was held that the motion to dissolve the interference was properly denied by the Primary Examiner, and, that being the only issue involved, the decision of the Examiner of Interferences was affirmed.

The only issue going to the merits of the case is whether appellee's application, as originally filed, discloses the use of "thyratron" tubes or their equivalents. It will be observed that the count involved specifically refers to "thyratron" tubes, and it is conceded that, in order for appellee

Eugene C. Brown, of Washington, D. C., for appellants.

J. W. Schmied, of New York City, for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an interference proceeding in which the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention to appellee, and appellants have brought the matter before us for review.

The interference arises between an application filed by appellee on May 21, 1930,

to prevail, his original application must disclose the use of such tubes or their equivalents.

Before discussing this question, we will refer to a preliminary matter raised by appellee. He moves to strike from the record an affidavit by one Frederick Holborn, and from the brief of appellants a statement with respect to alleged tests of thyratron tubes made by appellants.

■ It appears that appellants filed an affidavit by one Frederick Holborn respecting the meaning of the term "thyratron tubes." This affidavit was filed while appellants' appeal was pending before the Board of Appeals. The Board of Appeals in its decisions made no reference to this affidavit, and we have not considered it in arriving at our conclusion herein. Nothing in the rules of the Patent Office permit the filing of affidavits in interference cases after appeal to the Board of Appeals.

■ It also appears that in appellants' brief before the Board of Appeals, quotation was made from a letter purporting to have been written by Dr. Hull, hereinafter referred to. Appellee objects to the consideration of the quotation for the reason that the letter was not properly authenticated and only a portion of the letter was quoted from. The Board of Appeals made no reference to this letter, and we have not considered it, for the reasons stated by appellee.

■ With respect to the statement in appellants' brief respecting tests with thyratron tubes, there is nothing in the record to support the statement, and we have given it no consideration.

There is only one question before us upon the merits of the case, viz., whether appellee's application, as originally filed, discloses the use of "thyratron" tubes or their equivalent. In appellants' patent their tubes are not described other than by the name "thyratron." In appellee's application, as originally filed, the term "thyratron" is not found.

It appears that the term "thyratron" is a trade-mark owned by the General Electric Company, which mark was registered in the United States Patent Office on June 17, 1930, Registration No. 271,660, used for "Grid-Controlled Arc Tubes." As hereinbefore noted, the tubes disclosed in appellants' patent are described as "thyratron" tubes, and not otherwise. The tubes disclosed in ap-

pellee's application as originally filed are there described as follows:

"The three-electrode gas-filled glow discharge tubes used in the present invention may be produced by filling a highly evacuated small amplifier tube of the usual type with argon to a pressure of approximately 0.1 mm. of mercury. Other similar gases at suitable pressures may also be used. Such three-electrode tubes differ from tubes structurally the same but highly evacuated in that the grid is effective as a control element only for low values of plate current. If the grid is carried from the filament potential toward a more positive potential, a point is reached where the glow discharge within the tube begins and the plate current rises to a value determined by the 'B' battery voltage and the plate circuit resistance. Once the glow discharge is started the control of the grid is greatly reduced and becomes very small as the plate current rises to an appreciable value. Since the grid control practically disappears for high values of plate current it is necessary to provide some means for breaking the glow very shortly after it is started. The methods employed for doing this will be described in connection with the detailed description of the drawings."

On June 15, 1934, more than four years after the filing date of appellee's application, the following amendment was made thereto:

"—the name 'thyratron' has been applied to tubes of this type in articles entitled 'Gas-filled Thermionic Tubes' by A. W. Hull, published in the Journal of the American Institute of Electrical Engineers, November 1928, page 802; and 'Hot-cathode Thyratrons' by A. W. Hull, published in the General Electric Review for April 1929 and July 1929, Vol. 32, pages 213–223 and 390–399. In this specification tubes of this type will be called glow-discharge tubes, thermionic gas tube relays, thyratrons, gas-filled discharge devices, glow-discharge devices, gaseous discharge tubes," etc.

For the purposes of this case, we may ignore this amendment, for unless "thyratron" tubes or their equivalents are disclosed in appellee's application as originally filed, said amendment would concededly be new matter.

The Board of Appeals held that, as the term "thyratron" is not defined in appellants' patent, the term "must be construed

broadly as referring to a tube of this general type which will operate in the system."

For the meaning of the term "thyratron," the Board of Appeals relied upon certain published articles prepared by Dr. Albert W. Hull of the Research Laboratory of the General Electric Company, a portion of which articles appear in the record. One of said articles was published in Vol. 32, No. 4, of the General Electric Review in April, 1929; the other, it appears, was published in July, 1928. Appellants rely upon these articles as showing that appellee's application, as originally filed, does not disclose "thyratron" tubes, and appellee relies upon the same publications as showing that the tubes disclosed by him are the equivalents of, or have the same characteristics as, "thyratron" tubes as described by Dr. Hull.

The Board of Appeals, after quoting from said articles by Dr. Hull, stated, with respect to the characteristics and functions of "thyratron" tubes, as follows:

"Taking the entire article of Hull into consideration, it is evident that a thyratron is a grid-controlled arc tube or three electrode tube similar to a Pliotron, into which, after exhaust, a small amount of gas is introduced; and in which the grid or control element controls the starting of a discharge but is usually unable to stop the discharge. It also shows that thyratrons are not limited to any such specific structure as Morgenstern et al. contends, since in some, the grid may shield the entire cathode, while in others, it does not. It also shows that thyratron tubes can and have been made by introducing a small amount of gas at a low-pressure into a tube structure designed as a high-vacuum or Pliotron tube. It also shows that improved results can be obtained by modifying such structures so that the grid will completely shield the cathode."

The Board, in its decision denying a motion for reconsideration made by appellants, said:

"* * * we do not believe it is proper to hold that a thyratron, as the term is used in the patent, must have a grid which shields the whole cathode from the anode. We, therefore, stated in our decision that the term 'thyratron' must be construed broadly as referring to a tube of this general type which will operate in the system. By 'general type' we mean a gas filled tube in which a grid is employed to set it in operation."

Appellants insist that the Board of Appeals misapprehended the statements in the articles of Dr. Hull in that it assumed that the grid must physically shield the cathode, while in fact the shielding referred to by Dr. Hull is an electrostatic phenomenon made possible by the physical structure, and that thyratron tubes must permit the creation of this electrostatic phenomenon, and that the tubes disclosed by appellee do not permit this because of the shortness of the grids. Appellants state:

"* * * It is not the physical grid which shields the anode from the cathode, but rather the invisible electrostatic field set up by the potential of the grid and this grid field must completely shield the cathode from the anode."

We think appellants' contention that the shield referred to in Dr. Hull's articles embraces electrostatic phenomena as well as physical structure is correct. While certain figures in the article published in the April, 1929, number of the General Electric Review show that the grid structurally does not completely shield the cathode, we think that the article taken as a whole shows that the shielding referred to by Dr. Hull was in the form of an electrostatic field, rather than in the form of physical structure alone. However, it does not follow that tubes permitting only a partial shielding by electrostatic phenomena are not embraced within the term "thyratron tubes."

Appellants rely upon certain statements found in Dr. Hull's articles, a few of which we quote. The following are found in the article published in July, 1928:

"3. The grid must shield the whole cathode from the anode. In high vacuum tubes the protrusion of 5 per cent of the filament beyond the end of the grid results only in 5 per cent 'zero' current, which has no effect on operation except to reduce the useful power by this amount. As a thyratron such a tube is nearly worthless. It will pass full current at all reasonable grid voltages, since a small fraction of one percent of the total emission is sufficient to produce ions that will sheathe the grid. The uniformity of the grid is more important than in high vacuum tubes, since the amplification factor is determined entirely by the largest hole.

"This requirement of complete shielding makes even the small pliotrons of most standard types unsuitable for conversion into thyratrons by introducing gas, because of the shortness of the grids."

In the same article we find the following:

"The name thyratron * * * has been suggested for an arc whose starting can be controlled by a grid. It has been known for a long time that arcs could thus be controlled. * * * They have been the subject of an exhaustive study in this laboratory, under the direction of Dr. Langmuir, for several years, and the results of these investigations will soon be published by Langmuir and his associates. * * * Only the specific characteristics of hot-cathode thyratrons similar to the above rectifiers, which are very simple, will be described here.

"Figs. 23 and 24 show typical hot cathode thyratrons of this type. Their structure is identical with that of pliotrons except for the form of cathode and the limitations of filament voltage and grid size noted below.

"Their characteristics are also the same as pliotrons *when no plate current, or very little, is flowing.* The distribution of potential in the tube is then obviously the same as in a high-vacuum tube. The amplification factor is defined, as in ordinary vacuum tubes, as the ratio of plate to grid voltage that will keep the plate current at a constant small value. This factor determines at what grid voltage the tube will 'start.' * * * [Italics quoted.]

"As soon as plate current begins to flow the similarity to pliotrons ends. Such factors as mutual conductance and plate resistance do not exist, for the grid is instantly surrounded by a sheath * * * of positive ions, and has no further effect on the current."

From the article by Dr. Hull published in April, 1929, we quote the following:

"The requirements of thyratron grids differ in several respects from those of pliotron grids, and it is desirable to state these requirements briefly before describing the types of grid that have been found practical. They can, perhaps, be most simply pictured by pointing out the difficulties which are encountered on attempting to use pliotrons of standard types as thyratrons.

"The most serious difficulty, especially with the smaller pliotrons, is *incompleteness* of the grids. They are too short to shield the whole filament. This results in a small uncontrolled emission, so small that it is unobjectionable in a pliotron, but in a thyratron it determines the grid-control ratio, giving a ratio so large, often greater than unity, that the tubes are not very useful. * * *." (Italics quoted.)

It seems to be conceded that a pliotron is a high vacuum tube, into which no gas has been introduced.

Had the articles by Dr. Hull clearly set forth that a "thyratron" tube must be structurally different from a pliotron tube, we would conclude that the Board of Appeals erred in holding that appellee's application, as originally filed, disclosed, without so naming them, "thyratron" tubes or their equivalents, but we find in his article published in April, 1929, a Fig. 14, below which is the notation:

"Fig. 14. Plate Current v. Grid Voltage in a Pliotron UV-203A, and a Thyratron which Was Made from the Same Tube by the Addition of 0.005 Mm. Mercury Vapor."

The article also states, with respect to said Fig. 14, and also with respect to Fig. 15, as follows:

" * * * For purposes of comparison the thyratron might be said to have infinite mutual conductance and zero plate impedance. Figs. 14 and 15 show these characteristics, plotted to scale, for the 50-watt pliotron, UV-203A, with and without gas, *i. e., as thyratron and pliotron respectively.*" (Italics ours.)

From the above, it would seem that, in the opinion of Dr. Hull, a pliotron tube may be converted into a thyratron by introducing a certain quantity of gas into the pliotron tube. Dr. Hull states:

"The best range of *gas pressure* in a thyratron is between 1 and 50 microns for mercury vapor, for other gases, especially helium, it is somewhat higher."

Appellee's application, as originally filed, states:

"The three-electrode gas-filled glow discharge tubes used in the present invention may be produced by filling a highly evacuated small amplifier tube of the usual type with argon to a pressure of approximately 0.1 mm. of mercury. * * *"

While the last-quoted statements from Dr. Hull's article may be inconsistent

with other statements found in the article, we are of the opinion that the term "thyratron" must be construed broadly, as held by the Board of Appeals; and inasmuch as some of the statements in Dr. Hull's articles defining "thyratron" tubes embrace the tubes disclosed by appellee, we are constrained to hold that the Board of Appeals did not err in holding that appellee could make the claim corresponding to the count here involved, in view of the disclosure in appellee's application as originally filed.

For the reasons stated herein, the decision of the Board of Appeals is affirmed.

Affirmed.